**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

ANA BERMONTIZ-HERNÁNDEZ,

    Plaintiff,

        v.                     CIVIL NO.: 11-1963 (MEL)

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

**OPINION AND ORDER**

Ana Bermontiz-Hernández ("plaintiff" or "claimant") was born in 1957, has completed high school, and was employed as a teller and a head teller at a bank until April of 2004. (Tr. 139, 144). On November 23, 2005, plaintiff filed an application for Social Security disability benefits, alleging disability due to severe depression, bilateral carpal tunnel syndrome, cervical and lumbar discogenic disease, and fibromyalgia. (Tr. 143). The alleged onset date of the disability was April 7, 2004, while the end of the insurance period was December 31, 2009. (Tr. 139, 143). Plaintiff's application was denied initially, but granted upon reconsideration with an onset date of September 20, 2007. (Tr. 24). Plaintiff made a timely request for a hearing, requesting benefits under the originally requested onset date of April 7, 2004. Id. On May 19, 2009, a hearing took place before an Administrative Law Judge ("ALJ"). Id. Plaintiff waived her right to appear at the hearing, but was represented by counsel. Id. On June 9, 2009, the ALJ rendered a decision denying plaintiff's claim. (Tr. 32). The Appeals Council denied plaintiff's request for review on August 2, 2011; therefore, the ALJ's decision became the final decision of the Commissioner of Social Security (the "Commissioner" or "defendant"). (Tr. 6).

On September 30, 2011, plaintiff filed a complaint seeking review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), alleging that it was not based on substantial evidence. (D.E. 1, at 1-2). On May 29, 2012, defendant filed an answer to the complaint and a certified transcript of the administrative record. (D.E. 11; 12). Both parties have filed supporting memoranda. (D.E. 23; 26). For the reasons set forth below, the instant case is remanded to the ALJ.

## I.   LEGAL STANDARD

### A.   Standard of Review

Once the Commissioner has rendered his final determination on an application for disability benefits, a district court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing [that decision], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The court's review is limited to determining whether the ALJ employed the proper legal standards and whether his factual findings were founded upon sufficient evidence. Specifically, the court "must examine the record and uphold a final decision of the Commissioner denying benefits, unless the decision is based on a faulty legal thesis or factual error." López-Vargas v. Comm'r of Soc. Sec., 518 F. Supp. 2d 333, 335 (D.P.R. 2007) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam)).

Additionally, "[t]he findings of the Commissioner … as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). The standard requires "'more than a mere scintilla of evidence but may be somewhat less than a preponderance' of the evidence." Ginsburg v. Richardson, 436 F.2d 1146, 1148 (3d Cir. 1971) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

While the Commissioner's fact findings are conclusive when they are supported by substantial evidence, they are "not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam) (citing Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986) (per curiam); Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam)).  Moreover, a determination of substantiality must be made based on the record as a whole.  See Irlanda Ortiz, 955 F.2d at 769 (citing Rodríguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  However, "[i]t is the responsibility of the [ALJ] to determine issues of credibility and to draw inferences from the record evidence." Id. Therefore, the court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodríguez Pagán v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

**B.      Disability Under the Social Security Act**

To establish entitlement to disability benefits, the claimant bears the burden of proving that he or she is disabled within the meaning of the Social Security Act.  See Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 146-47 (1987).  An individual is deemed to be disabled under the Social Security Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S. C. § 423(d)(1)(A).

Claims for disability benefits are evaluated according a five-step sequential process.  20 C.F.R. § 404.1520; Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 804 (1999); Yuckert, 482 U.S. at 140-42.  If it is determined that the claimant is not disabled at any step in the evaluation process, then the analysis will not proceed

to the next step.  At step one, it is determined whether the claimant is working and thus engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If so, then disability benefits are denied.  20 C.F.R. § 404.1520(b).  Step two requires the ALJ to determine whether the claimant has "a severe medically determinable physical or mental impairment" or severe combination of impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  If he does, then the ALJ determines at step three whether the claimant's impairment or impairments are equivalent to one of the impairments listed in 20 C.F.R. part 404, subpart P, appendix 1.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, then the claimant is conclusively found to be disabled.  20 C.F.R. § 404.1520(d).  If not, then the ALJ at step four assesses whether the claimant's impairment or impairments prevent her from doing the type of work he or she has done in the past.  20 C.F.R. § 404.1520(a)(4)(iv).  If the ALJ concludes that the claimant's impairment or impairments do prevent her from performing her past relevant work, the analysis then proceeds to step five.  At this final step, the ALJ evaluates whether the claimant's residual functional capacity ("RFC"),[1] combined with her age, education, and work experience, allows her to perform any other work that is available in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).  If the ALJ determines that there is work in the national economy that the claimant can perform, then disability benefits are denied.  20 C.F.R. § 404.1520(g).

Under steps one through four, the plaintiff has the burden of proving that he cannot return to his former job because of his impairment or combination of impairments.  Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989) (per curiam).  Once he has carried that burden, the Commissioner then has the burden under step five "to prove the existence of other jobs in the national economy that the plaintiff can perform."  Id.

---

[1] An individual's residual functional capacity is the most that he or she can do in a work setting despite the limitations imposed by her mental and physical impairments.  20 C.F.R. § 404.1545(a)(1).

**II.    THE MEDICAL EVIDENCE CONTAINED IN THE RECORD**

On February 25, 2004, Dr. Manuel Martínez del Toro ("Dr. Martínez del Toro"), who had been treating plaintiff since 1993, conducted an electrodiagnostic examination.  (Tr. 583.) The results of the tests of plaintiff's upper extremities were "[c]ompatible with a mild bilateral median nerve entrapment across carpal tunnel."  Id.

The medical record contains miscellaneous progress notes from plaintiff's treatment under the auspices of the State Insurance Fund Corporation ("SIFC") between August 4, 2000, and August 4, 2005.  (Tr. 182-279, 312-453, 475-555).  On April 27, 2004, plaintiff received an MRI of the lumbosacral spine, which showed that plaintiff had "[d]isk desiccation and small central broad-based disk bulge at L5-S1" with "[n]o significant spinal canal stenosis," and "[d]egenerative changes of the facets joints at L5."  (Tr. 356).

On June 10, 2004, Dr. Alberto Rodríguez Robles ("Dr. Rodríguez Robles"), a psychiatrist with the SIFC, conducted a psychiatric evaluation of plaintiff.  (Tr. 341-46).  Plaintiff indicated that she lived with her husband; her relationships with her parents, children, relatives, neighbors, and friends were good; and her social relations were cordial.  Dr. Rodríguez Robles concluded that plaintiff could take the initiative to communicate and participate in group activities. Plaintiff's daily activities involved watching television and listening to the radio.  She was able to use transportation, to take care of her personal hygiene, and to get dressed on her own.  She was well-developed and nourished, and her hair was combed.  Plaintiff's affect, memory, judgment, and flow of thoughts were adequate.  Plaintiff was fully oriented and did not have suicidal ideas, but did experience pessimistic thoughts, depressed mood, and diminished attention and concentration.  Dr. Rodríguez Robles recommended psychiatric treatment and rest, and prescribed Prozac and Klonopin.

Dr. Rodríguez Robles conducted another psychiatric evaluation on July 15, 2004.  (Tr. 514-19).  Most of his observations remained the same, although plaintiff's affect was constricted and she "looked depressed with psychomotor retardation" in the second evaluation.  In both evaluations, Dr. Rodríguez Robles's diagnosis was major depressive affective disorder, single episode, severe, without psychotic features.   See generally American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) [hereinafter DSM–IV].

The same day, plaintiff received an MRI of her cervical spine, which showed "[s]traightening of the normal cervical curvature which could be related to muscle spasm or patient positioning."  (Tr. 335).

On January 27, 2005, Dr. Martínez del Toro filled out a neurological report pertaining to disorders of the spine.  (Tr. 282-90, 572-78).  He noted that plaintiff had carpal tunnel syndrome since 1993.  Plaintiff was experiencing severe neck and back pain, associated numbness, and sensory abnormalities in both hands.  Dr. Martínez del Toro concluded that plaintiff was unable to push, pull, grasp, lift, or carry objects and that plaintiff had bilateral median nerve entrapment, causing carpal tunnel.  Plaintiff's treatment had involved physical therapy and medication, without response.

Dr. Jorge L. Méndez Colón ("Dr. Méndez Colón"), who had been treating plaintiff since 1999, issued a general medical report on January 30, 2005.  (Tr. 636-42).  He indicated that plaintiff was experiencing insomnia, irritability, and recurrent neck, shoulder, and chest pain; it was difficult for her to interact with others; she needed the assistance of family; she was worsening with a poor response to treatment; and she could not manage her money.

On February 9, 2005, Dr. Samuel Méndez Figueroa ("Dr. Méndez Figueroa") conducted a consultative neurological examination of plaintiff.  (Tr. 291-99).  Plaintiff claimed that light

house duties, cold weather, sudden movements, walking for more than twenty minutes, lifting more than four pounds, raising her arm, and remaining in the same position for more than one hour would exacerbate her symptoms.  During the evaluation, plaintiff had adequate memory and was alert, fully oriented, and cooperative.   Dr. Méndez Figueroa noted that plaintiff had bilaterally intact cranial nerves, tender cervical and lumbar paraspinal muscles, adequate bulk, no atrophy or spasm, symmetrical reflexes, unassisted gait with no foot drop or limping, "[s]trength of 4/5 symmetrically in all extremities (limited by pain)," and mildly decreased "[p]inpricking and proprioception … in hands."  (Tr. 291-93).  Dr. Méndez Figueroa also concluded that plaintiff could grip, grasp, pinch, finger tap, oppose fingers, button a shirt, pick up a coin, and write with both hands.  Plaintiff's Tinel test was bilaterally positive, while her Phalen, Lasegue, and straight leg raising tests were negative.

Dr. Osvaldo Rivera Marrero, state agency medical consultant, reviewed the medical record and completed a physical RFC assessment on March 3, 2005.  (Tr. 300-08).  He concluded that plaintiff was able to lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; push and/or pull without limit; balance or kneel frequently; and climb, stoop, crouch, or crawl occasionally.  Plaintiff had manipulative limitations due to carpal tunnel syndrome.

On March 21, 2005, Dr. Hazel A. Toledo-Espiet ("Dr. Toledo-Espiet") conducted a consultative psychiatric evaluation.  (Tr. 309-11).  Plaintiff indicated that she lived in a house with family, did not help with house cleaning, did not leave the house alone, and required help with medications.  Her behavior was depressive and underactive.  Thought blocking was evident.  Responses to daily living stress included isolation and crying spells.  She experienced ideas of invalidism and frustration.  While she was able to name the capital and governor of Puerto Rico,

plaintiff had trouble with recent and remote memory, had variable attention span, required instructions to be repeated several times, and was unable to spell "mundo" backwards.  On the other hand, plaintiff attended church weekly, appeared her chronological age, wore appropriate attire, and had adequate hygiene.  She was alert, cooperative, and fully oriented.  Plaintiff had good eye contact; normal speech; logical, coherent, and relevant thought process; fair judgment; and no tics or tremors, suicidal ideas, delusions, or perceptual disturbances.  Dr. Toledo-Espiet diagnosed plaintiff with major depressive disorder, recurrent, severe, without psychotic features under DSM–IV, assigned her a Global Assessment of Functioning ("GAF") of 50,[2] gave her a guarded prognosis, and concluded that she was able to assume full responsibility over herself and her economic funds.

Dr. Luis F. Umpierre Vela ("Dr. Umpierre"), state agency clinical psychologist, reviewed the medical record and completed a mental RFC assessment and psychiatric review technique on June 13, 2005.  (Tr. 454-72).  In each functional category, Dr. Umpierre concluded that plaintiff was either "not significantly limited" or "moderately limited"; in no category was plaintiff "markedly limited."  Dr. Umpierre determined that plaintiff had a depressive syndrome and suffered a moderate degree of limitation in activities of daily living, social functioning, and concentration, persistence, or pace.  He determined that plaintiff remained able to understand, remember, and carry out very short and simple instructions; to maintain attention for two hours

---

[2] The GAF "is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'"  DSM–IV, at 32, quoted in Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004).  It "considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DSM–IV, at 34 (brackets omitted), quoted in Echandy-Caraballo v. Astrue, 2008 WL 910059, at *4 n.7 (D.R.I. Mar. 31, 2008).  "A score of 50 is on the borderline between serious and moderate symptoms."  Colón v. Barnhart, 424 F. Supp. 2d 805, 809 n.3 (E.D. Pa. 2006).  A GAF between 41 and 50 "indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job),'" id. (quoting DSM–IV, at 34), while one between 51 and 60 "indicates the individual has '[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning,'" Pate-Fires v. Astrue, 564 F.3d 935, 938 (8th Cir. 2009) (quoting DSM–IV, at 32).

at a time; to maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to maintain a simple pace without unreasonable rest periods; to get along with coworkers; and to respond appropriately to changes in a work setting.

The record also contains discharge notes from Dr. Rodríguez Robles, dated June 30, 2005. (Tr. 480-83). He observed that plaintiff was "depressed and slow." Plaintiff had a constricted affect, depressive mood, diminished attention and concentration, and ideas of worthlessness, helplessness, and hopelessness. He concluded that plaintiff had experienced no improvement after completing the five authorized treatment sessions.

On September 22, 2005, Dr. Martínez del Toro, one of plaintiff's treating physicians, issued a report on plaintiff's impairments. (Tr. 564-68). The signs, findings, and symptoms of the impairments included tenderness, muscle spasm, a positive straight leg raising test, sensory changes, impaired sleep, reduced grip strength, and significant limitation of motion. Plaintiff's pain was moderately severe in the neck and back, at a daily and constant frequency. Dr. Martínez del Toro noted that plaintiff had a poor response to treatment, and that her pain constantly interfered with her attention and concentration. He determined that plaintiff could sit and stand or walk less than 2 hours during an 8-hour workday, rarely lift less than 10 pounds or climb stairs, and never look down, turn her head, look up, twist, stoop or bend, crouch or squat, or climb ladders. Dr. Martínez del Toro determined that plaintiff would likely be absent more than four days per month. He gave plaintiff a poor prognosis for rehabilitation.

In connection with her application for Social Security disability benefits, plaintiff filled out a function report on November 16, 2005. (Tr. 123-38). The only way plaintiff indicated that her personal care was affected by her condition was that she could not raise or stretch her arms.

Although she asserted that she could not do household chores, she also stated that she prepared her own meals, did the dishes, made the beds, and did the laundry.   She went outside occasionally with accompaniment, either by driving or being driven.   Plaintiff shopped in stores with accompaniment weekly.   She indicated that she preferred to be alone, but talked with others occasionally and went to church weekly.

On March 6, 2006, Dr. Alfredo Pérez Canabal ("Dr. Pérez") conducted a consultative neurological examination of plaintiff.   (Tr. 556-62).   Plaintiff experienced tenderness in the head, neck, and back.   Dr. Pérez assessed plaintiff's strength as "5/5," including the ability to pinch, handle, and carry.   Plaintiff's Tinel and Phalen tests were positive, while her Babinski, Hoffman, and straight leg raising tests were negative.   Dr. Pérez indicated that plaintiff was able to grip, grasp, pinch, finger tap, oppose fingers, button a shirt, pick up a coin, and write with both hands.   Plaintiff had adequate gait, good coordination, no atrophy, adequate tone, and adequate sensation.   Dr. Pérez's diagnostic impressions were carpal tunnel syndrome, cervical myositis, and low back pain.

Dr. José Cuebas ("Dr. Cuebas"), state agency medical consultant, reviewed the medical record and completed a physical RFC assessment on May 3, 2006.   (Tr. 592-601).   He concluded that plaintiff was able to lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; push and/or pull without limit; climb, balance, kneel, or crawl frequently; and stoop or crouch occasionally.   Plaintiff experienced manipulative limitations in handling and fingering, but not reaching or feeling.

On July 6, 2006, Dr. Rodríguez Robles conducted a psychiatric evaluation as a consultant.   (Tr. 655-61).   Plaintiff was isolated and withdrawn, and indicated that she did not

like to interact with others. She was apprehensive and depressed, showed psychomotor retardation, and had a constricted affect and diminished attention and concentration. She was preoccupied with ideas of worthlessness, helplessness, and despair. Nevertheless, she could take care of her personal hygiene and get dressed by herself. She was fully oriented and had no suicidal ideas, perceptual disorders, or history of psychiatric hospitalizations. She was well-developed and nourished, and her hair was combed. Plaintiff's flow of thoughts was slow, but logical, coherent, and relevant. She had adequate judgment, insight, and remote, past, recent, and immediate memory. Dr. Rodríguez Robles again determined that plaintiff had major depressive affective disorder, single episode, severe, without psychotic features. Dr. Rodríguez Robles concluded that plaintiff's prognosis was poor and that she did not have the capacity to handle her funds.

Dr. Jeanette Maldonado ("Dr. Maldonado"), state agency clinical psychologist, reviewed in the medical record and completed a mental RFC assessment and psychiatric review technique on July 13, 2006. (Tr. 602-25). The ability to carry out detailed instructions was the only functional category in which Dr. Maldonado determined plaintiff was "markedly limited." In each other function category, plaintiff was either "not significantly limited" or "moderately limited." Dr. Maldonado concluded that plaintiff had a depressive syndrome and suffered a moderate degree of limitation in activities of daily living and concentration, persistence, or pace. According to Dr. Maldonado, plaintiff was capable "of understand[ing], of remember[ing] and of perform[ing] simple tasks within the weekly demands of pace, of concentration for more than two hours period [*sic*] and of sustainability." Plaintiff could "tolerate routine supervision, make work related decisions and interact with peers in an acceptable manner."

Dr. Méndez Colón issued a report on plaintiff's cervical and lumbar RFC on September 30, 2006.  (Tr. 626-35).  He determined that plaintiff had significant limitation of motion, moderately severe pain, a positive straight leg raising test, and a poor prognosis.  Plaintiff could sit and stand or walk for less than 2 hours in an 8-hour workday; rarely lift and carry less than 10 pounds, hold her head in a static position, or climb stairs; and never look down, turn head, look up, twist, stoop or bend, crouch or squat, or climb ladders.  Dr. Méndez Colón concluded that plaintiff was likely to be absent more than four days per month due to her condition.

In connection with her appeal of the initial denial of Social Security disability benefits, plaintiff filled out another function report on February 20, 2007.  (Tr. 163-78).  Her daily activities involved preparing coffee and toast for husband and herself, doing the dishes after breakfast, and feeding her dog in the morning.  The only way plaintiff indicated that her personal care was affected by her condition was that her daughter combed her hair.  She sometimes prepared sandwiches.  Although she would not go out alone, she would drive or be driven, went to church regularly, and went out with her daughter to attend plaintiff's medical appointments.

On March 28, 2007, Dr. Méndez Figueroa conducted another consultative neurological examination.  (Tr. 663-71).  During the evaluation, plaintiff was alert, fully oriented, cooperative, and had adequate memory.  Although she had tender cervical and lumbar paraspinal muscles and mildly decreased pinpricking and proprioception in her hands, plaintiff had adequate bulk, "[s]trength of 4/5 symmetrically in all extremities (limited by pain)," no atrophy or spasm, symmetrical reflexes, and unassisted gait with no foot drop or limping.  Plaintiff's Tinel test was positive bilaterally, while her Phalen, Lasegue, and straight leg raising tests were negative.  Dr. Méndez Figueroa concluded that plaintiff could grip, grasp, pinch, finger tap, oppose fingers, button a shirt, pick up a coin, and write with both hands.  Plaintiff exhibited "[s]traightening of

the normal lordosis, possibly due to muscle spasm," and "[m]ild degenerative disc disease at L3-L4."

On May 4, 2007, Dr. Acisclo Marxuach, state agency medical consultant, reviewed the medical record, noted that the additional medical evidence did not show any worsening, and adopted Dr. Cuebas's physical RFC assessment from May 3, 2006.  (Tr. 672-73).

Dr. Rodríguez Robles performed another consultative psychiatric evaluation on August 23, 2007.  (Tr. 643-51).  All of the findings from Dr. Rodríguez Robles's evaluation on July 6, 2006, discussed above, were also included in his August 23, 2007, evaluation.

On September 4, 2007, Dr. Luis Rodríguez, state agency medical consultant, reviewed the medical record and adopted Dr. Maldonado's mental RFC finding with respect to simple tasks.  (Tr. 674-75).

## III.   ANALYSIS

### A.   The ALJ's Resolution of Conflicts in the Record

Plaintiff argues that the ALJ's step five analysis was not based on substantial evidence because it did not properly give weight to the opinions of three treating physicians— Dr. Rodríguez Robles, Dr. Martínez del Toro, and Dr. Méndez Colón[3]—thus affecting the RFC determination and the hypothetical posed to the vocational expert.  In a Social Security disability benefits case, an ALJ should generally give more weight to a treating physician's opinions, because such doctors "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [claimant's] medical impairment(s)."  20 C.F.R. § 404.1527(d)(2).  An ALJ, however, may disregard them upon a showing of good cause: "(1) that they are brief and

---

[3] Although the ALJ refers to both Dr. Méndez Colón and Dr. Méndez Figueroa as "Dr. Mendez" in his opinion, compare (Tr. 27 para. 1) (referring to Dr. Méndez Figueroa's finding of "4/5" hand strength limited by pain) with (Tr. 27 para. 3) (referring to Dr. Méndez Colón's determinations concerning plaintiff's temporal limitations on, *inter alia*, sitting, standing, and walking), it appears to be Dr. Méndez Colón's evidence that the ALJ discounts when he refers to "[Dr.] Mendez' conclusion that the claimant's residual functional capacity is limited to a very narrow range of sedentary work," (Tr. 31 para. 1; see also Tr. 27 para. 3).

conclusory, (2) not supported by medically acceptable clinical laboratory diagnostic techniques, or (3) are otherwise unsupported by the record."  Carrasco v. Comm'r of Soc. Sec., 528 F.Supp.2d 17, 25 (D.P.R. 2007).  An ALJ should "'always give good reasons' for the weight [he] gives a treating source opinion."  Soto-Cedeño v. Astrue, 380 F. App'x 1, 3 (1st Cir. 2010) (quoting 20 C.F.R. § 404.1527(c)(2)).

The only evidence that plaintiff provides that the ALJ disregarded Dr. Rodríguez Robles's opinion is that the ALJ did not incorporate plaintiff's psychomotor retardation and slow flow of thought into the hypothetical presented to the vocational expert.[4]  (See D.E. 23, at 14-15).  Defendant argues that Dr. Rodríguez Robles's observations "were not consistent with the other medical evidence in the record" and that the ALJ's findings were supported by the three state agency doctors, Dr. Umpierre, Dr. Maldonado, and Dr. Luis Rodríguez.  (See D.E. 26, at 14).  As an initial matter, it is true that "the testimony of a non-examining medical advisor … can alone constitute substantial evidence, depending on the circumstances."  Berríos López v. Sec'y of Health & Human Services, 951 F.2d 427, 431 (1st Cir. 1991).  Such evidence, however, "must be 'substantial,' and, under the regulations, the weight given to a nonexamining opinion will depend on the degree to which it provides supporting explanations."  Ormon v. Astrue, No. 11-2107, 2012 WL 3871560, at *3 (1st Cir. Sept. 7, 2012) (internal quotation omitted).  The state agency doctors' reports in this case "contain little more than brief conclusory statements" and as such "are entitled to relatively little weight."  Berríos López, 951 F.2d at 431.  Nevertheless, in this case the ALJ was not relying exclusively on the opinions of the non-examining medical advisors.  In addition to relying on the state agency doctors' opinions, the ALJ pointed to

---

[4] Plaintiff also discusses how reduced attention and concentration may result in reduced productivity.  Although the ALJ did not refer to Dr. Rodríguez Robles's reports on that issue specifically, the ALJ did acknowledge that plaintiff had "moderate difficulties in maintaining concentration," factoring it into his determination that plaintiff was limited to unskilled work.  (Tr. 28).

evidence in the record that plaintiff was logical, coherent, relevant, and fully oriented; had adequate memory and judgment; did not have any perceptual disturbances, suicidal or homicidal ideas, or psychosis; and gave excellent historical accounts of her symptoms at her examinations with Dr. Rodríguez Robles and adequate descriptions of her personal, medical, and occupational background to the consultative neurologists, psychiatrist, and disability interviewers.[5]

Although Dr. Maldonado concluded that Dr. Rodríguez Robles's opinions regarding plaintiff's mental status are not supported by the rest of the medical record, the ALJ himself did not adopt that determination.  In fact, the ALJ indicated that "[Dr.] Rodriguez' assessment[ is] supported by appropriate clinical signs." (Tr. 28).  The appropriate inquiry, therefore, is whether Dr. Rodríguez Robles's opinions are consistent with the ALJ's determinations.   The ALJ concluded that plaintiff was "limited to unskilled, simple and repetitive tasks, not involving contact with the public and/or frequent contact with coworkers and supervisors."  (Tr. 29). Unskilled work requires "the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."  Social Security Ruling 85– 15, 1985 WL 56857, at *4 (1985).   Psychomotor retardation is "[a]n overall slowing of movement, speech, and mental processes."  Polanco-Quinones v. Astrue, 477 F. App'x 745, 748 (1st Cir. 2012) (quoting 5 J.E. Schmidt, M.D., Attorney's Dictionary of Medicine, at P–520.1 to P–520.2 (2011)).   Mere observations that plaintiff "looked depressed with psychomotor retardation," (Tr. 518), was "showing psychomotor retardation," (Tr. 648, 660), or had "slow"

---

[5] Plaintiff argues that it was erroneous for the ALJ to point out that she was coherent, logical, relevant, and fully oriented, because these attributes "are not requisites to meet the diagnostic criteria of a major depressive disorder." (D.E. 23, at 17).  Plaintiff seems to misunderstand the ALJ's purpose of including these observations.  The ALJ specifically concludes that plaintiff had the severe impairment of "moderate single episode major depressive disorder" during the relevant period.  (Tr. 26).  Thus, the ALJ does not refer to evidence that plaintiff was coherent, logical, relevant, and fully oriented to demonstrate that plaintiff did not have major depressive disorder.  Rather, it is evidence that plaintiff, despite having major depressive disorder, retained the mental RFC for unskilled work.

flow of thoughts, (Tr. 482, 519, 648, 660), are vague and indicate little about the extent of their impact on plaintiff's ability to meet the mental demands of unskilled work.  As such, they do not necessarily contradict the ALJ's conclusions.   Rather, the ALJ understood Dr. Rodríguez Robles's observations as support for his conclusions that plaintiff had moderate difficulties in maintaining social functioning, was limited to unskilled work, and could not have contact with the public or frequent contact with coworkers and supervisors.[6]

Dr. Martínez del Toro and Dr. Méndez Colón determined that plaintiff "could sit, stand and walk for less than two hours and lift and carry less than ten pounds rarely" and thus "was limited to a very narrow range of sedentary work." (Tr. 27).  The ALJ specifically rejected these conclusions, stating that (1) "their reported clinical signs and laboratory findings … fail to reveal significant pathology and thus to support their markedly restricted functional capacity assessments," (2) "said assessments are refuted by the findings from the other treating source and from the consultative physicians," and (3) the assessments "are not supported by their own medical findings." (Tr. 27, 31).  The ALJ pointed out that there was no evidence in the record of swelling, deformities, increased heat, significant limitations in the range of motion of the major joints, persistent or significant tenderness or muscular spasms, degenerative changes in the lumbar spine, significant sensory deficits, muscular weakness, motor atrophy, or reflex abnormalities.   The ALJ also noted that plaintiff's range of motion of the cervical and lumbosacral spine was not markedly restricted and that plaintiff had adequate gait.  Dr. Méndez Figueroa and Dr. Pérez reported levels of strength of "4/5" and "5/5," respectively, and plaintiff's neurological system was normal.  The ALJ stated that plaintiff had no adverse side effects to her treatment and had no persistently disabling musculoskeletal, neurological, or

---

[6] To the extent that observations of psychomotor retardation and slow flow of thought indicate, if at all, that plaintiff was incapable even of unskilled work, it is the responsibility of the ALJ to resolve such a conflict in the record.  See Irlanda Ortiz, 955 F.2d at 769.

mental pathology. Despite her pain and discomfort, plaintiff had been able to take care of her personal needs and had adequate interpersonal relationships. As discussed above, an ALJ may disregard a conclusion of a treating source if it is unsupported by the record. Here, the ALJ provided ample evidence that Dr. Martínez del Toro's and Dr. Méndez Colón's physical RFC determinations were unsupported by the record. Thus, it was appropriate for the ALJ to disregard said determinations.

### B.      Cross-Examination of the Vocational Expert

Plaintiff argues that her due process rights were violated when the ALJ did not allow her counsel's question to be posed to the vocational expert. "'Due process requires that a social security hearing be "full and fair."'" Méndez v. Comm'r of Soc. Sec., 300 F. Supp. 2d 317, 321 (D.P.R. 2003) (quoting Flatford v. Chater, 93 F.3d 1296, 1305 (6th Cir. 1996)). As such, "'[j]udicial review in [social security] cases, although necessarily deferential to the agency's determination, must nonetheless be undertaken with a recognition that the "beneficent purposes" underlying the Social Security Act, are best served by insuring that the agency has developed a complete evidentiary record.'" Id. (quoting Walker v. Massanari, 149 F. Supp. 2d 843, 846 (S.D. Iowa 2001)). To ensure a full and fair hearing, "[c]laimants have a right to cross-examine vocational experts." Haddock v. Apfel, 196 F.3d 1084, 1090 (10th Cir. 1999); see also Ramos v. Astrue, Civ. No. 10-1220 (JAG/BJM), 2011 WL 1311725, at *15 (D.P.R. Mar. 7, 2011) (noting courts' "concerns about due process and the claimant's inability to cross-examine the [vocational expert]"), report and recommendation adopted sub nom. Ramos v. Comm'r of Soc. Sec., Civ. No. 10-1220 (JAG), 2011 WL 1364214 (D.P.R. Apr. 4, 2011).

Here, the ALJ during the hearing did not allow a question by plaintiff's counsel, stating:

> Counsel, that question is not appropriate because it does not specify—it was not formulated to articulate the functions—the functional capacities. It is a list. Essentially, a list of symptoms that do not give the [vocational expert] enough

> information to be able to formulate an opinion about the functional capacity.  If you would like to restate your question in a way that it specifies functions and gives specific information about how long the functions can be performed, I will happily allow you to.  If not, then we will continue with something else.

(Tr. 698).  Plaintiff's counsel objected to the ALJ's ruling and declined to rephrase the question.  Plaintiff argues that the ALJ was incorrectly indicating that her counsel cited plaintiff's "symptoms" rather than "areas of functioning."  (D.E. 23, at 18-19 n.21).  Although the ALJ did refer to plaintiff's counsel's question as "[e]ssentially … a list of symptoms," his use of the term "symptoms" does not appear to be a dispositive element of his refusal to allow the question as asked.  (Tr. 698).  Rather, the ALJ was primarily concerned that the question "d[id] not give the [vocational expert] enough information to be able to formulate an opinion about the functional capacity."  Id.  The ALJ's concern is consistent with the requirement that "'hypothetical questions posed to vocational experts … precisely set out the claimant's particular physical and mental impairments."  Lancaster v. Comm'r of Soc. Sec., 228 F. App'x 563, 573 (6th Cir. 2007) (quoting Tennant v. Schweiker, 682 F.2d 707, 711 (8th Cir. 1982)).  Although typically courts focus on the precision of the hypothetical questions asked by the ALJ rather than the claimant, see, e.g., Miller v. Barnhart, 43 F. App'x 200, 204 (10th Cir. 2002); McGhee v. Harris, 683 F.2d 256, 259 (8th Cir. 1982); Daniels v. Mathews, 567 F.2d 845, 848 (8th Cir. 1977), problems arising from a defective hypothetical question do not disappear merely by being asked on cross-examination.  For an ALJ to rely on the testimony of a vocational expert, it must be sufficiently related to plaintiff's actual impairments.  See Arocho v. Sec'y of Health & Human Services, 670 F.2d 374, 375-76 (1st Cir. 1982) (holding that a question which "inadequately conveys to the [vocational] expert the precise time limits on the claimant's daily activities" did not result in "relevant testimony").

Here, plaintiff's question involved an extensive list of functional limitations.  (Tr. 697).  But there are numerous ambiguities embedded in the question.  It is unclear whether plaintiff's counsel intended the items on the list to be conjunctive or separate hypothetical questions.  Because the functional capacity of "maintaining concentration and persistence" is identified separately from the other items, it is unclear whether the attribute of "marked limitations" applies merely to that particular item or to the entire list.  Furthermore, plaintiff's counsel's use of the qualifier "for example" before most of the items on the list makes it unclear whether the specified items were only a subset of the functional limitations encompassed by the question.  Finally, plaintiff's counsel does not clarify the extent of any of the functional limitations, whether temporal or otherwise.  As such, it was not a violation of due process for the ALJ to request that plaintiff's counsel rephrase his hypothetical question to specify how long each function in question could be performed by plaintiff.

### C.  Plaintiff's Ability to Interact with Supervisors and Coworkers

Finally, plaintiff argues that the Commissioner failed to meet his burden at step five of the analysis because the vocational expert's testimony was based on an incorrect assumption about plaintiff's ability to interact with supervisors and coworkers.  Typically, the Commissioner meets his burden at step five, as in the instant case, by relying on the testimony of a vocational expert.  Ramos v. Sec'y of Health & Human Services, 514 F. Supp. 57, 64 (D.P.R. 1981).  "But in order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities."  Arocho, 670 F.2d at 375.  In order to ensure that the answer is relevant, therefore, an ALJ "must both clarify the outputs (deciding what testimony will be credited and resolving ambiguities), and accurately transmit the clarified output to the expert in the form of assumptions."  Id.

Here, the ALJ failed to transmit the assumptions to the vocational expert accurately.  The Commissioner argues that the hypothetical question tracked claimant's RFC, "including the limitation in the ability to interact with coworkers and supervisors."  (D.E. 26, at 18).  A comparison of the ALJ's decision and the transcript of the hearing, however, does not sustain this argument.  The ALJ determined that claimant's mental RFC "was limited to unskilled, simple and repetitive tasks, not involving contact with the public and/or frequent contact with coworkers and supervisors."  (Tr. 29).  In contrast, the hypothetical posed to the vocational expert by the ALJ concerned a person who "can have a maximum vocational contact with supervisors and coworkers."  (Tr. 694).  "A response to a defective hypothetical question does not constitute substantial evidence."  O'Leary v. Schweiker, 710 F.2d 1334, 1343 (8th Cir. 1983).

The Commissioner also argues that "there is no indication from the descriptions of the two jobs identified by the vocational expert … that those jobs require anything more than occasional interaction with coworkers and supervisors."  (D.E. 26, at 18).  But if a hypothetical question "does not clearly encompass" claimant's limitations, then the answer "will assuredly be irrelevant and may not be relied on by the administrative law judge."  Huertas v. Astrue, 844 F. Supp. 2d 197, 202-03 (D. Mass. 2012); see also Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1270 (11th Cir. 2007) ("In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments").  During the hearing, the vocational expert made no mention of the extent a person in one of the two jobs would have to interact with coworkers or supervisors.  The appropriate standard of review on this issue is whether there was substantial evidence to support the ALJ's determination that the Commissioner met his burden to show that there were jobs that

existed in significant numbers in the national economy that plaintiff could have performed during the period in question.  It was thus the Commissioner's burden to establish before the ALJ that the identified jobs did not "require anything more than occasional interaction with coworkers and supervisors" and as such were consistent with the ALJ's determination of plaintiff's limitations.   With only testimony based on an incorrect hypothetical, the Commissioner's burden could not have been discharged.  As such, there was not substantial evidence to support the ALJ's determination at step five.

## IV.  CONCLUSION

Based on the foregoing, the case is hereby **REMANDED** to the Commissioner for a rehearing consistent with the ALJ's determination that plaintiff "was limited to unskilled, simple and repetitive tasks, not involving contact with the public and/or frequent contact with coworkers and supervisors."  (Tr. 29).

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 14th day of January, 2013.

s/Marcos E. López<br>
U.S. Magistrate Judge